Case 1:18-cr-00398-RPK   Document 316   Filed 01/17/24   Page 1 of 5 PageID #: 3591



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NEM/ALK/RSB
F. #2017R00089

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 17, 2024

By ECF

The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Amador-Rios et al.
               Criminal Docket 18-398 (S-3) (RPK)

Dear Judge Kovner:

      The government submits this letter in advance of the defendant Luis Rivas' sentencing, which is scheduled for January 23, 2024 at 3:00 p.m. On July 14, 2023, Rivas pleaded guilty pursuant to an agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) to Count One of the Third Superseding Indictment, which charged him with racketeering. As part of the agreed-upon pattern of racketeering activity, Rivas admitted to his participation in the murder of sixteen-year-old Julio Vasquez and the armed robbery of Joanie's Princess Card, a check cashing business in Queens, New York. For the reasons set forth below, the government recommends that the Court impose the agreed-upon sentence of 420 months' imprisonment followed by a period of five years supervised release.

      I.    Background

      The defendant's conviction stem from crimes he committed as a member of La Mara Salvatrucha, also known as MS-13. MS-13 is a violent transnational criminal organization with members located throughout Long Island, Queens, and other parts of New York, as well as in other parts of the United States. Members and associates of MS-13 have engaged in acts of violence, including murder, attempted murder, robbery, and assault, as well as other criminal activity, including narcotics trafficking, extortion, witness tampering, and witness retaliation. MS-13 operates through chapters, or "cliques," throughout the United States, which report and funnel money to a central leadership. Gang membership is considered a lifetime commitment, with only rare exceptions that allow individuals to leave the gang. Clique members often carry out directives from regional, national and international MS-13 leaders, including orders to kill witnesses, rival gang members, and potential cooperating or defecting MS-13 members. MS-13 cliques assist each other in carrying out violent crimes, harboring fugitives, acquiring firearms, distributing narcotics and other criminal activity.

A. <u>The Defendant's Role in MS-13</u>

The defendant was a full-fledged member, a "homeboy," during the entire racketeering period and participated in the violent initiation of members into the gang. He was a "homeboy" on January 8, 2017, when he committed the armed robbery of Joanie's Princess Card, during which he pistol whipped the store owner and remained a "homeboy" at the time he murdered Julio Vasquez. He continuously participated in crimes on behalf of the gang including weapons possessions, and violent assaults and robberies until his arrest on May 18, 2017.[1]

B. <u>Murder of Julio Vasquez</u>

On the night of May 16, 2017, the defendant and co-defendants Melvi Amador Rios ("Melvi") and Josue Leiva lured sixteen-year-old Julio Vasquez, a "chequeo," or low-level member, to Alley Pond Park to murder him. Once inside the park, Leiva and Rivas stabbed Vasquez repeatedly in the back, torso and neck and then left his body there.

About five days later, on the morning of May 21, 2017, a bird watcher found Vasquez's decomposing body. An autopsy revealed that Vasquez suffered at least 34 sharp force injuries to his back and torso, which resulted in injuries to his left lung and liver. Vasquez also suffered numerous sharp force injuries to his neck, many of which were deep enough to cause slash marks on his vertebrae. The medical examiner observed that Vasquez's carotid artery—which is located deep in the neck, behind muscles—was completely severed. The medical examiner determined that the manner of Vasquez's death was a homicide caused by sharp force injuries to his neck and torso.

Melvi ordered Vasquez's murder because Vasquez had disobeyed Melvi's order to kill another CLS chequeo who had fallen into poor standing with CLS. Melvi chose Vasquez to carry out that murder because Vasquez was also in poor standing with the clique for a variety of reasons. Melvi purportedly intended to forgive Vasquez's transgressions if he carried out Melvi's order to murder the other CLS chequeo. Melvi gave Vasquez one week to carry out the murder, but Vasquez failed to do so. When Vasquez failed to meet the murder deadline, Melvi, Rivas and Leiva lured Vasquez to Alley Pond Park and murdered Vasquez.

Rivas' co-defendant, Leiva, boasted about what they had done to Vasquez in the park indicating that Vasquez was stabbed over twenty times and that Vasquez had defecated on himself. Leiva also confessed that Leiva and Rivas had lured Vasquez into the park by telling Vasquez they were going to attack rival gang members; and that, after luring him into the park, Leiva and Rivas stabbed Vasquez repeatedly on his body and neck and, when he did not die, slit his throat. During the violent attack, Vasquez pleaded and told them they were wrong about his suspected cooperation. Unmoved, Leiva and Rivas stabbed Vasquez to death.

---

[1] The PSR incorrectly states that Rivas was arrested on May 8, 2017. PSR ¶ 35. The government respectfully requests that the PSR be amended to state that he was arrested on May 18, 2017.

2

The morning after the heinous murder, Rivas appeared in Queens Criminal Court for a regularly scheduled court appearance on an unrelated state weapons charge where he was arrested on an outstanding warrant for separate state charges including attempted murder, assault in the first degree (intent to cause serious injury with a weapon), and robbery in the first degree.

### C. Armed Robbery

The defendant also carried out an armed robbery of Joanie's Princess Card with other MS-13 members and associates on January 8, 2017. At the time of the robbery, the front counter of the establishment was protected by a glass partition that extended towards the ceiling but left a gap between the ceiling and the top of the partition. On the night of the robbery, the owner, a woman who has owned that store for twenty years, was alone inside the store on the phone with her husband when Melvi, Rivas and Santos Amador-Rios, Melvi's brother and fellow MS-13 member, entered the store with ski masks covering their faces. Melvi and Rivas each held a gun and scaled the partition. Melvi stole the money from behind the counter while Rivas held the owner at gunpoint. On the way out, Rivas pistol whipped the owner in the face causing a laceration on her face, which required thirteen stitches to close. They stole approximately $65,000 and caused chaos and disarray behind the counter.

## II. Guidelines Calculation

The Presentence Investigation Report ("PSR") finds the advisory Guidelines range is 360 months to life. Specifically, the PSR calculates the adjusted offense level for Racketeering Act 2 (Hobbs Act Robbery) is 30, and the adjusted offense level for Racketeering Act 5B (Murder of Julio Vasquez) is 43. PSR ¶¶ 77-90. The combined adjusted offense level is 43. PSR ¶ 94. With acceptance of responsibility, the offense level is decreased by two levels. Because the defendant pleaded guilty after juror questionnaires had been completed and three days before in-person jury selection began, the government does not intend to move for an additional one-level reduction pursuant to Guideline § 3E1.1(b). Accordingly, the government requests that Paragraph 98 of the PSR be amended to reflect that the total adjusted offense level is 41, not 40.

As to the defendant's criminal history category, the government agrees that, under the Amendments to the Sentencing Guidelines which became effective on November 1, 2023, the defendant has fewer than six criminal history points and thus is no longer subject to the two additional status points for committing the instant offense while under a criminal justice sentence. See U.S.S.C. §4A1.1(e). In light of that change, the PSR would arrive at four criminal history points, and a criminal history category of III. The Guideline imprisonment range would remain 360 months to life. PSR ¶ 135. The offense level of 41, with a criminal history category of III, results in an advisory Guidelines range of 360 months to life.

Rivas argues that his convictions for robbery in the second degree (PSR ¶ 101) and assault in-aid-of racketeering (PSR ¶ 102) should not be assessed any criminal history points because, he asserts, the conduct underlying those convictions qualifies as "relevant conduct" in the instant case under Guideline § 1B1.3. Under Federal Rule of Criminal Procedure 32(i), the Court need not resolve this dispute if it would not affect the Court's ultimate sentence. See Fed. R. Crim. Proc. 32(i)(3)(B) (stating that the court may decline to resolve any sentencing dispute if it "determine[s] that a ruling is unnecessary . . . because the matter will not affect sentencing"); see

3

also United States v. Bertuglia, 591 F. App'x 39, 40 (2d Cir. 2015) (declining to consider arguments relating to defendant's career offender status "because the district court explained repeatedly that the disputed classification made no difference to the sentence imposed"); United States v. Borrego, 388 F.3d 66, 69 (2d Cir.2004) ("[T]o require the court to rule on issues which would have no effect on the sentence would merely require performance of a meaningless academic exercise."). Here, the parties have agreed that "a specific sentence of 420 months' imprisonment, followed by a period of supervised release of five years, is the appropriate term of imprisonment and term of supervised release in this case," Plea Agmt. ¶ 2, and both parties urge the Court to impose that sentence. Accordingly, the government respectfully submits that the Court should decline to resolve the dispute Rivas raises relating to whether his robbery and assault convictions are "relevant conduct" or instead should be assessed criminal history points.

III.  Discussion

For the reasons set forth below, the government respectfully requests that the Court impose the agreed-upon sentence of 420 months' imprisonment followed by a period of five years supervised release. Such a sentence is appropriate given the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

Section 3553(a) requires sentencing courts to consider a number of factors in imposing sentence, including the nature and circumstances of the violation and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, promote respect for the law, and provide just punishment; the need for the sentence to adequately deter criminal conduct; the need to protect the public from further crimes of the defendant; and the need to provide the defendant with needed education, vocational training, medical care and/or other correctional treatment in the most effective manner. Sentencing courts must also consider the kinds of sentences available, the applicable Guidelines and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.

Here, the agreed-upon sentence, which the defendant and the U.S. Probation Department urge the Court to impose as well, reflects the nature and circumstances of the offenses and the history and characteristics of the defendant, avoids unwarranted sentencing disparities, and promotes general and specific deterrence. See 18 U.S.C. § 3553(a). The defendant's crimes were horrific, senseless, and reflect his utter disregard for human life. The defendant, Melvi and Leiva lured Vasquez, a sixteen-year-old boy to Alley Pond Park where the defendant and Leiva savagely stabbed him while he pleaded for his life. Vasquez was nearly decapitated, and his body was left to rot. His mother and his siblings were left to worry about him for days until a birdwatcher happened upon his decomposing body.[2] The defendant then was arrested for another horribly violent crime the day after the murder, while he appeared in court on a separate weapons charge. The defendant's antisocial behaviors cannot be overstated.

---

[2] A victim impact statement provided by Vasquez's mother in connection with the sentencing of Melvi Amador Rios is enclosed under seal.

4

The defendant's armed robbery was also terrifying. He scaled the almost ceiling high barrier, ostensibly meant to protect the store owner from this very thing, crashed down on to the front counter causing utter disarray, and then proceeded to hold the store owner at gunpoint while Melvi rifled through the cash register for money. On the way out, Rivas gratuitously and violently pistol whipped her in the face causing her skin to split open and requiring thirteen stitches. To this day, the store owner bears mental scars from Rivas' terrifying actions. She also suffers physical pain from her injuries. As her husband testified at trial regarding those injuries, "They were very serious, because even up until now, it still has repercussions because she still gets dizzy spells because of the injury to her forehead." Tr. 597:21-23.

Although the defendant pleaded guilty shortly before trial, he has not demonstrated any remorse for the brutal murder of Vasquez, or for traumatizing the victim of the armed robbery he committed—both of which have had profound and lasting impact on the victims and their families and friends, as well as the many witnesses and community members who were touched by the violence. The agreed upon sentence is sufficient to bring a measure of justice to Julio Vasquez, his family and loved ones, and to the community the defendant and his confederates further tore apart and terrorized with years of needless violence. Likewise, imposition of the agreed upon sentences is needed to protect the community and as a significant deterrent, both as a sign to the community and the defendant that gang-related violence fueling violent turf wars, as well as brazen, brutal murders and robberies such as those he committed are not tolerated under the law. Individuals hoping to impress gang members and other racketeering enterprises by committing violence should know of the potential consequences. The allure of joining a notorious enterprise like MS-13—and committing violence on its behalf—should be outweighed by the prospect of a significant sentence.

IV.  Conclusion

For the foregoing reasons, the Court should sentence the defendant to 420 months of imprisonment to be followed by a period of five years of supervised release.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  _____/s/_____
Nadia E. Moore
Anna L. Karamigios
Raffaela S. Belizaire
Assistant U.S. Attorneys
(718) 254-7000

cc:   Clerk of Court (RPK)
      Counsel for defendant (via ECF)